**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

```
*******************************************
In re:                                     *    Chapter 11
                                           *    Case No.  01-11565
BANGOR & AROOSTOOK RAILROAD                *
COMPANY,                                   *
                                           *
      Debtor                               *
*******************************************
JAMES E. HOWARD, CHAPTER 11                *
TRUSTEE OF BANGOR & AROOSTOOK              *    Adversary Proceeding
RAILROAD COMPANY and CANADIAN              *    No. 03-1210
AMERICAN RAILROAD COMPANY,                 *
                                           *
      Plaintiff                            *
                                           *
v.                                         *
                                           *
BANGOR HYDRO ELECTRIC COMPANY,             *
                                           *
      Defendant                            *
*******************************************
```

**MEMORANDUM OF DECISION**

This preference recovery action is before me on a stipulated record. James E. Howard, trustee for railroad reorganization debtors Bangor & Aroostook Railroad Company ("BAR") and Canadian American Railroad Company ("CAR") contends that, together, BAR and CAC transferred $62,023.71 to Bangor Hydro-Electric Company on account of overdue electric utility bills in the 90 days before their bankruptcies. Acknowledging receipt, Bangor Hydro contends the funds cannot be recovered as preferences under the statutory exception for payments in the "ordinary course of business," or, alternatively, they are partially insulated from recovery under the statutory "new value" exception.

Although the payments at issue were outside terms, their tardiness and inconsistency

portrays a ragged regularity in the railroads' relationships with Bangor Hydro. Moreover, the debtors and Bangor Hydro conducted business within industry norms. I conclude that the ordinary course of business defense applies and, therefore, judgment will enter in Bangor Hydro's favor.[1]

### Background[2]

BAR maintained thirty-nine electrical accounts with Bangor Hydro. Two accounts were by far the most active, accounting for ninety percent of Bangor Hydro's billings of BAR. CAR had nine accounts with Bangor Hydro during the preference period. In the ninety days before bankruptcy Bangor Hydro received allegedly preferential payments of $56,509.90 from BAR and $5,513.81 from CAR. In each case the payments were remitted in consideration for transmission and supply of electricity. Bangor Hydro billed all accounts monthly, requiring payment twenty-five days from billing. BAR's and CAR's payments were routinely late.[3]

### Discussion

The Bankruptcy Code provides for recovery of preferential transfers in § 547(b):

---

[1] This memorandum contains my findings of fact and conclusions of law rendered in accordance with Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Reform Act of 1978, as codified, 11 U.S.C. § 101, et seq.

[2] The factual background is drawn from the parties' stipulations, together with the affidavit of Janice Piper and the amended affidavit of Brian L. Stevens, each of which has been submitted, without objection, by Bangor Hydro.

[3] During the preference periods, Bangor Hydro provided value (electricity transmission and supply) to BAR and CAR for which it was unpaid on the date of each railroad's bankruptcy. The extent of unpaid "new value" services provided to each of the debtors is documented in the stipulation at paragraphs 17 and 26. My conclusion that the ordinary course of business defense has been proved obviates the need to evaluate Bangor Hydro's new value defense.

>  (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property -
>
>  (1) to or for the benefit of a creditor;
>  (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>  (3) made while the debtor was insolvent;
>  (4) made -
>  (A) on or within 90 days before the date of the filing of the petition; or
>  (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>  (5) that enables such creditor to receive more than such creditor would receive if -
>  (A) the case were a case under chapter 7 of this title;
>  (B) the transfer had not been made; and
>  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The parties agree that, but for Bangor Hydro's defenses, all of the payments Howard seeks to avoid and reclaim would be recoverable as preferences.

Bangor Hydro contends that § 547(c)(2) supplies a complete defense. Section 547(c)(2) provides:

>  (c) The trustee may not avoid under this section a transfer -
>
>  *    *    *
>  (2) to the extent that such transfer was -
>  (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>  (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>  (C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2). This so-called "ordinary course of business defense" is intended to leave normal financial relations undisturbed because their occurrence does not offend the general

preference recovery policy, aimed at discouraging "'unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'" 5 Lawrence P. King, Collier on Bankruptcy ¶ 547.04[2], at 547-54 (15th ed. rev. 2004) (quoting legislative history) (hereafter "Collier"); see also Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.,), 132 F.3d 104, 109 (1st Cir. 1997).

> On the one hand, the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.

Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.), 18 F.3d 217, 219 (3d Cir. 1994). The ordinary course of business exception "benefits all creditors by protecting payments received by those creditors who remain committed to a debtor during times of financial distress while at the same time affording a measure of flexibility to creditors in dealing with the debtor, provided that the steps taken are consistent with customary practice among industry participants." Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 41 (2d Cir. 1996).

To fall under the "ordinary course of business" exception, a transferee must show that "(1) the underlying debt on which payment was made was 'incurred in the ordinary course of business or financial affairs' of both parties, (2) the transfer was 'made in the ordinary course of business or financial affairs' of both parties, and (3) the transfer was 'made according to ordinary business terms.'" 5 Collier ¶ 547.04[2][a], at 547-54. The defendant must prove each element by

a preponderance of the evidence. Id.; see also 3 William L. Norton, Jr., Norton Bankruptcy Law and Practice 2d § 57:14, at 57-76-77 (1997) (hereafter "Norton").

The parties do not dispute the first element of the ordinary course defense, that the debts on which the railroads made payment to Bangor Hydro within the preference periods were incurred in the ordinary course of their business. That leaves for decision whether Bangor Hydro has proved the second and third prongs of the defense.

1. § 547(c)(2)(B)

The defense's second element requires a defendant to demonstrate that a debtor's transfers to it were made in the ordinary course of both its business and the debtor's business. This so-called "subjective" element focuses on the parties' relationship with one another. In re Healthco, 132 F.3d at 109-10; Howison v. Adkin Plumbing & Heating Supply Co. (In re Websco, Inc.), 92 B.R. 1, 3 (Bankr. D. Me. 1988). To determine whether a transfer was made in the ordinary course, courts focus on the timing of payment, the historic course of dealings between the debtor and the transferee, and the circumstances under which the transfer was made.

> Courts have relied upon a number of different "factors" in determining whether the payment is ordinary for purposes of subparagraph (B). The four factors most commonly cited by courts in making this determination are:
> (1) length of time the parties were engaged in the transaction in issue;
> (2) whether the amount or form of tender differed from past practices;
> (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and
> (4) the circumstances under which the payment was made.

5 Collier ¶ 547.04[2][a], at 547-59; see also In re Healthco, 132 F.3d at 109 (amount, timing, history, circumstances). The inquiry is highly subjective and case-specific.

5

"'[T]here is no precise legal test which can be applied' in determining whether payments by the debtor during the 90-day period were 'made in the ordinary course of business'; 'rather, the court must engage in a 'peculiarly factual' analysis.'" Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991) (quoting In re Fulghum Constr. Corp., 872 F.2d 739, 743 (6th Cir. 1989)). The signal factor is whether the transactions between the debtor and the creditor, both before and during the 90-day period, were consistent. Id.; In re Healthco, 132 F.3d at 110. "[T]he analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90-day period reflected 'some consistency' with that practice." Lovett, 931 F.2d at 498; see also Official Plan Comm. v. Expediators Int'l of Washington, Inc. (In re Gateway Pacific Corp.), 153 F.3d 915, 917 (8th Cir. 1998).

"Thus, '[e]ven if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties.'" Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.), 888 F.2d 42, 45 (6th Cir. 1989) (quoting In re Fulghum Constr. Corp., 872 F.2d at 742). It is the actual course of business between the parties, rather than the stated terms governing their relationship, which controls. "Normally, if late payments were the standard course of dealing between the parties, they shall be considered as within the ordinary course of business under section 547(c)(2)." Id. at 44.

Here we have two debtors and multiple accounts. The record includes account histories stretching back several years before the bankruptcies. The railroads' payments were consistently late. Bangor Hydro applied the payments it received for each account to the oldest open invoice for that account. Sometimes a payment on a given account was sufficient to pay off one or more

6

open invoices.

**The BAR Accounts**. In the year preceding its bankruptcy, BAR paid Bangor Hydro a total of $292,924.43. Twenty-two percent of that sum was paid during the preference period.[4] For one of BAR's two most active accounts (#3229-78328), the average interval from billing to payment was 48.7 days during the preference period. The average interval for the preceding three months was 46.7 days. And, over the nine months preceding the preference period, the payment interval averaged 51.2 days. Dating back to 1999, the account had been substantially in arrears at times, but more recently the payment intervals generally hovered in the neighborhood of 50 days. For the other most active account (#3229-56935), the payment interval during the preference period averaged 62.4 days. For this account the overall payment history is more erratic. The average payment interval shortened a bit during the preference period - it had been 80.6 days and 80.0 days in the two preceding quarters. But, in view of the payment history for the two year period preceding bankruptcy, BAR's payment practices during the preference period reflect no remarkable departure from the parties' longstanding course of dealing. The remaining seven BAR accounts (payments on which represent but ten percent of the total asserted preferential payments) demonstrate consistent payment inconsistency, but no departure from the past practices in the days before bankruptcy.

**The CAR Accounts**. Review of the CAR accounts shows only that the company apparently paid its utility bills every couple of months, regardless of account terms. Taking two of the accounts as examples, it is apparent that payment practices during the preference period

---

[4] Checks in the amount of $63,759.17 (a small portion of which is not sought in this action) were cut in the preference period; $69,190.13 in the preceding quarter; $68,190.23 in the quarter before that; and $79,897.86 in the first three months of the year before bankruptcy.

mirrored historical dealings. The first account (#37690-72656) reflects billing-to-receipt payment intervals of 84, 52, 42, 56, 23, 57, 28, 55, 84, **112, 80, 50, 54,** and **56** days in the year before bankruptcy.[5] The second account (#37690-72335) displays payment intervals of 103, 71, 55, 85, 55, 56, 23, 57, 28, 55, 84, **113, 80, 50,** and **54** days for the same period. Within the preference period there is no meaningful variation on the irregular payment theme.

**Bangor Hydro's Practices**. The affidavit of Janis Piper, a twenty-seven year employee who has served as Bangor Hydro's Superintendent of Customer Service since 1994, reinforces the impression created by the account histories. Ms. Piper's responsibilities include implementing Bangor Hydro's credit and collection policies. She avers that the "policies and procedures applied to [BAR and CAR] accounts by Bangor Hydro were the same policies and procedures applied to all Bangor Hydro accounts."[6] Moreover, she states that, "[w]hile most of Bangor Hydro's business customers pay on time, there are a large number who do not."[7]

> When a particular customer account does not meet the 25 day billing terms, as was the case with the BAR and [CAR] accounts, Bangor Hydro's policy is to employ collection methods to try to bring the customer current. These collection methods consist of phoning the customer, setting up payment plans, sending disconnection notices, and sometimes disconnecting service on the account until amounts due under a payment plan are tendered. The only caveat to these procedures is that it its Bangor Hydro's policy not to disconnect service if to do so would likely cause a hazardous condition.
>
> Nevertheless, in spite of the payment plans, disconnect notices, and even actual disconnections, Bangor Hydro does have

---

[5]   Bolded numbers denote preference period payments.

[6]   Affidavit of Janis Piper, dated August 24, 2004, at ¶ 7 (hereafter "Piper Affid. at _").

[7]   Piper Affid. at ¶ 8.

8

> some customers with whom its course of business in actual practice consists of routinely late and/or erratic payments punctuated by frequent collection efforts by Bangor Hydro staff. Regarding such customers it can be routine for Bangor Hydro to receive payments over a period of several years that are consistently applied to invoices that are several months old. At any given time, a small but noticeable percentage of Bangor Hydro's accounts fit this description.[8]

During the 1990's and beyond, Bangor Hydro's dealings with BAR and CAR reflected its practices with other, perpetually delinquent customers. Bangor Hydro implemented collection measures, including a few disconnections, although the utility's ability to terminate service was limited by its policy to avoid creating hazards.[9] The "collection mode" became routine, as did Bangor Hydro's acceptance of late and erratic payments.

> By December, 1999, the established business between Bangor Hydro and both [railroads] consisted of erratic payments punctuated by frequent in-house collection action of the type previously mentioned. This course of business fit within the range of Bangor Hydro's ordinary business practices at the time.[10]

Howard does not challenge Piper's credibility. Conceding that late payments can be (or become) "ordinary" between a debtor and a creditor, Ferrer v. Prusa Distrib. Corp. (In re Kiddy Toys, Inc.), 178 B.R. 928, 934 (Bankr. D.P.R. 1994), Howard urges that they are ordinary only when the parties "adopt" them as "normal" practice, Miller v. Perrini Corp. (In re A.J. Lane & Co.), 164 B.R. 409, 414 (Bankr. D. Mass. 1994). Because the payments at issue were made, he contends, "in response to collection efforts," they simply cannot be characterized as ordinary

---

[8]  Piper Affid. at ¶¶ 10, 11.

[9]  Piper Affid. at ¶12.

[10]  Piper Affid. at ¶ 13. This pattern continued until the bankruptcies, but Bangor Hydro effected no disconnections on any BAR or CAR account during the respective preference periods. Piper Affid. at ¶¶ 14-16.

9

course.

If Howard intends to say that, as a matter of law, once a creditor initiates any collection activity, subsequent payments cannot be within the ordinary course of the parties' business, I reject that proposition.  See In re Healthco, 132 F.3d at 106 (noting significance of *difference* in collection attempts made by creditor *prior to* preference period and *during* preference period); Arrow Elecs., Inc. v. Justus (In re Kaypro), 218 F.3d 1070, 1073 (9th Cir. 2000) (creditors whose debtors are paying under debt rescheduling plan also have right to try and prove ordinary course defense).  Evaluating the "ordinary course" between a specific debtor and a specific creditor is fact intensive.  Id.; see also In re Roblin Industries, 78 F.3d at 41-42 (recognizing that debt restructuring may be an "ordinary and usual practice" within an industry under § 547(c)(2)(C)). Such a bright line rule would shortstop the factual inquiry and would raise more questions than it answered: How much collection activity triggers it?  A letter?  A phone call?  A chance meeting where slow/non-payment is mentioned?  Once "collection activity" is commenced, when, if ever, will its impact wane?  Does it matter if the activity is ignored and payments continue to come in as before?

This case demonstrates the frailty of Howard's argument:  Bangor Hydro took collection action regularly, but, over time, the railroads' behavior did not change appreciably in response to those actions. That state of affairs continued to and through the preference periods.  As Ms. Piper stated: the railroads delinquent conduct continued "in spite of" Bangor Hydro's attempts to rectify it.[11]

---

[11] Piper Affid. at ¶ 11.  Howard argues that Bangor Hydro's collection efforts evidence its refusal to "adopt" extra-contractual terms.  But the question is not whether there was mutual assent to contract modification.  Rather, it is whether, with rights reserved or not, the parties

10

Howard also contends that since most Bangor Hydro customers pay on time, and that since the railroads are among only a "small percentage" of recalcitrant customers, their relationships were not ordinary course. The argument misses the mark. Under § 547(c)(2)(B), the question is what was ordinary *for these parties.* In re Healthco, 132 F.3d at 109; see generally 5 Collier ¶ 547.04[2][a], at 547-58-61. That the majority of Bangor Hydro's customers pay on time is of no moment here.[12]

There was no *unusual* payment or collection activity during the preference periods. How the parties did business may have been "unusual" compared with the bulk of Bangor Hydro's customers, but it was (unhappily) routine for them. "Inasmuch as the hallmark of a payment in the ordinary course is consistency with prior practice," In re Healthco, 132 F.3d at 110, the payments at issue meet § 547(c)(2)(B)'s requirements.

   2. § 547(c)(2)(C)

The third element of the § 547(c)(2) defense requires that the transfers at issue be made "according to ordinary business terms." This element, commonly referred to as the "objective" test, involves practices within the relevant industry or line of commerce. It is separate and distinct from § 547(c)(2)(B)'s consideration of dealings between the parties. Barber v. Golden Seed Co.,

---

continued a non-compliant payment routine. Under such circumstances, some measure of collection activity can become "usual" rather than "unusual." After all, the purpose of preference avoidance is not to discourage all collection activity. The aim is to discourage *unusual* collection activity that inspires unusual payments within the preference period - and to recapture those payments for all creditors.

[12]     See 3 Norton § 57:19, at 57-97-98 ("Where payments are so late as to be inconsistent with prior transactions *between the particular parties*, the payments would not fit within the subjective test. However, late payments could be so common *between the particular parties* as to meet that subjective test and also be in compliance with industry practice.") (Emphasis added; footnotes omitted).

11

129 F.3d 382, 390 (7th Cir. 1997); Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc., 957 F.2d 239, 245-46 (6th Cir. 1992).

A leading decision defines "ordinary business terms" as including the "*range* of terms that encompass the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1033 (7th Cir. 1993) (citations omitted); see generally 5 Collier ¶ 547.04 [2][a], at 547-61. The question is whether the payments at issue were made "within the outer limits of normal industry practice." In re Tolona Pizza Prods., 3 F.3d at 1033.[13]

The "industry standard" component of the "ordinary course" defense operates in two ways to assure that it is fairly applied. First, "[i]f the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in the industry, this casts some doubt on his (self-serving) testimony." Id. at 1032. Second, it allays creditors' concerns that "one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy." Id.[14]

---

[13] Tolona Pizza's formulation of the issue is generally accepted among the circuits. See Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.), 315 F.3d 1192, 1197 (9th Cir. 2003) (collecting cases), *amended by*, 326 F.3d 1028; see generally 5 Collier ¶ 547.04[2][a].

[14] Some courts consider that the relevant importance of complying with "industry standards" wanes as the length of the pre-petition relationship between the debtor and the creditor lengthens. They consider that if the parties have sustained a constant relationship over a course of time, the likelihood of unfair overreaching by a creditor to obtain payment on the brink of insolvency is reduced. E.g., In re Molded Acoustical Prods., 18 F.3d at 225 ("[T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)."). This case does not require consideration of this so-called "sliding scale" approach.

In support of its contention that the BAR and CAR account relationships proceeded within ordinary business terms, Bangor Hydro relies on, in addition to Ms. Piper's affidavit, the affidavit of Brian Stevens, Supervisor of Credit and Collections for Central Maine Power Company ("CMP"). Between them, Bangor Hydro and CMP deliver (and bill for) electrical service for the lion's share of commercial and residential customers in Maine.[15]

Mr. Stevens outlines CMP's account management policies in much the same terms as Ms. Piper explained Bangor Hydro's. Aside from CMP's standard 30-day payment term, CMP manages its troubled accounts in very nearly the same way as Bangor Hydro manages its. After confirming that a "large number" of business accounts do not pay their bills on time,[16] Mr. Stevens states:

> Regarding business customers who do not pay on time, it is CMP's policy to telephone the customer regarding payment and to establish payment plans designed to allow the customer to pay its bills and also pay its arrearages. CMP also routinely sends disconnect notices to such customers warning that their service is in danger of being disconnected if payment is not received.
>
> Nevertheless, in spite of the telephone communications, payment plans, disconnect notices, and even actual disconnections, CMP does have some customers, particularly those in financial distress, with whom its course of business in actual practice consists of routinely late payments. For such customers it can be routine to have payments coming in that are applied to invoices 35 days old, 45 days old, or even 75 days old.

---

[15] The record does not establish the market share held by the two utilities. However, it is generally known in this district (and, alternatively, capable of ready determination) that Bangor Hydro and CMP deliver electricity to well over half of Maine's households and businesses. Fed. R. Evid. 201(b).

[16] Amended Affidavit of Brian Stevens, dated August 30, 2004, at ¶ 5 (hereafter "Stevens Affid. at __").

> It is common for a course of business consisting of such late payments to continue for a number of months or even years, often punctuated by various broken payment plans, last-minute payments to avoid disconnection, disconnections and reconnections.
>
> It is also common for a course of business consisting of such late payments to be irregular, meaning that no payment might be received in some months, and/or the customer may go for a period of time where payments are routinely being applied to invoices over 90 days old.[17]

The Piper and Stevens affidavits support the proposition that electric utilities in Maine deal with a significant number of business customers with chronically delinquent accounts and irregular payment practices. With such customers, the utilities take various steps to collect arrears and keep the accounts as current as possible. However, there are some customers whose payments are tardy and sporadic for years at a time. As to them, the utilities may routinely take action to inspire timely, dependable payment, going so far as to interrupt service on occasion. They tolerate chronic performance outside terms, without re-writing those terms, and maintain service so long as some payments are made.[18]

Howard does not contend that, taken together, the affidavits are insufficient to prove what "ordinary business terms"[19] are for electric utilities (or some other line of commerce) operating in

---

[17]    Stevens Affid. at ¶¶ 7-10.

[18]    This case bears strong resemblance to Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.), 91 F.3d 811, 817 (6th Cir. 1996) (analyzing payment histories for gas utility bills, holding that course of payments outside terms conformed to industry standard, and citing with approval Jones v. United Sav. and Loan Ass'n (In re USA Inns of Eureka Springs, Ark., Inc.), 9 F.3d 680, 685 (8th Cir. 1993), in which testimony to the effect that "it is regular practice in the savings and loan industry to work with delinquent customers *as long as some type of payment is forthcoming"* was credited) (Emphasis added).

[19]    Some evidence of practices in the industry (in addition to practices between the parties) is essential to a creditor's § 547(c)(2)(C) showing. Gulf City Seafoods, Inc. v. Ludwig

Maine (or some other region).[20]  Rather, echoing his § 547(c)(2)(B) argument about late payments and collection activities, he urges that industry practices regarding late-paying or financially distressed debtors do not reflect the "ordinary business terms" to which § 547(c)(2)(C) refers.  I disagree.

Accepting late payments can come within the industry standard.[21]  Applying § 547(c)(2)(C), "the court must look to 'those terms employed by similarly situated debtors and creditors facing the same or similar problems.  If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry.'  The determination requires 'a factual inquiry that is appropriately left to the bankruptcy court.'" In re Kaypro, 218 F.3d at 1074 (quoting In re Roblin Industries, 78 F.3d at 41, 42).  The First Circuit's decision in In re Healthco, 132 F.2d at 109-10, which determined that a late payment, dwarfing all earlier payments (late or otherwise) was preferential, accords generally with this proposition.

Clark v. Balcor Real Estate Fin., Inc. (In re Meredith Hoffman Partners), 12 F.3d 1549, 1554 (10th Cir. 1993), upon which Howard relies, is the only circuit level decision declaring a

---

Shrimp Co. (In re Gulf City Seafoods, Inc.), 296 F.3d 363, 368-69 (5th Cir. 2002); Miller v. Florida Mining & Materials (In re AW & Assocs., Inc.), 136 F.3d 1439, 1442-43 (11th Cir. 1998); In re Tolona Pizza Prods., 3 F.3d at 1033.  The question presents itself case by case, and, thus, the manner of proving industry practices will vary.  At least one commentator has observed that the "majority of courts ... appear to require independent, expert testimony of standard business terms in the applicable industry for the defendant to prove objective ordinariness." 3 Norton § 57:19, at 57-102.  That rule is not universal, and where, as here, no challenge to the competence or credibility of the defendant's proof is raised, it has no application. Even when challenged as self-serving, testimony from the defendant's employee may suffice if that employee has sufficient experience in the industry.  See In re Kaypro, 218 F.3d at 1075 (bankruptcy court erred in giving creditor's employee's testimony "no weight").

[20]     Identifying the "relevant industry" can be a challenging undertaking.  E.g., In re Tolona Pizza Prods., 3 F.3d at 1033.   The point is simply not at issue here.

[21]     See Norton, supra n.12.

15

contrary rule. I am unconvinced that its teaching holds sway here. <u>Meredith Hoffman Partners</u> addressed a payment scheme involving an escrow arrangement imposed to assure that a mortgagee was paid (ahead of other creditors) by a delinquent debtor. It is factually distinguishable. Moreover, the Tenth Circuit articulated its holding unnecessarily broadly. Following that broad pronouncement blindly would run counter to the settled teaching that a trial court should consider each case on its peculiar facts.

Bangor Hydro's unchallenged evidence establishes that the manner in which it dealt with BAR and CAR was within the "outer limits" of "normal industry practice" and, therefore, that it has satisfied § 547(c)(2)(C)'s requirements.

## **Conclusion**

Bangor Hydro has proved that the payments it received from BAR and CAR during their respective preference periods were made in the ordinary course of business within the meaning of § 547(c)(2). The payments at issue were outside terms, but well within the parties ordinary dealings. Like mules disinclined to move forward without constant prodding, BAR and CAR paid Bangor Hydro under a routine that included the utility's regular efforts to encourage payment.

During the preference periods, the prodding continued, but there were neither unusual payments nor unusual collection efforts.

| February 25, 2005 | /s/ James B. Haines, Jr. |
|---|---|
| Date | James B. Haines, Jr.<br>U.S. Bankruptcy Judge |